William GEARHARDT, d/b/a Cary Concrete Products Co., et al., Plaintiffs-Appellees,

v.

AMERICAN REINFORCED PAPER CO., Defendant-Appellant.

No. 11968.

United States Court of Appeals Seventh Circuit.

June 18, 1957.

Walter I. Deffenbaugh, Thomas C. Strachan, Jr., Chicago, Ill., for appellant. Pope & Ballard, Chicago, Ill., of counsel.

Gates W. Clancy, Fred J. O'Connor, Chicago, Ill., for appellee. Robert C. Jenkins, Chicago, Ill., of counsel.

Before MAJOR, LINDLEY and SCHNACKENBERG, Circuit Judges.

LINDLEY, Circuit Judge.

Plaintiffs brought suit in the district court, claiming that their cement block plant building had been damaged by fire caused by defendant's negligent burning of debris in the rear of its plant. From the judgment entered in pursuance of a verdict in favor of plaintiffs, defendant appeals, asserting that there is not sufficient credible evidence to sustain the verdict and judgment and that the court erred in receiving evidence concerning other fires on defendant's premises prior to October 8, 1953, and in permitting the witness Jungnickel to testify. As a

corollary to its argument that there is not sufficient credible evidence to support the verdict, defendant asserts also that the jury was not justified in finding for plaintiffs in view of the fact, as defendant contends, that the undisputed physical conditions irrefutably contradicted plaintiffs' testimony.

Plaintiffs William Gearhardt and Harriet Gearhardt, it was averred, are co-owners of the damaged premises. Other plaintiffs were insurance companies who had reimbursed plaintiffs in part and claimed to be subrogated to their rights in the amounts paid.

Plaintiffs relied upon § 53 of Chapter 38, Illinois Revised Statutes 1951, which provides a penalty for knowingly permitting fire to pass from one's property to that of another, and creates a penalty for negligently causing a fire which damages another's property. Plaintiffs charged that defendant, by its customary method of burning paper on its grounds, violated the statute and that its continuous action in this respect amounted to maintenance of a nuisance; that on October 9, 1953, certain sparks or flames of pieces of ignited paper were carried by the wind from a fire on defendant's premises and ignited plaintiffs' building, causing damages thereto amounting to $33,000; that plaintiffs were in the exercise of due care and caution for the safety of their property, and that defendant was negligent in permitting the fire to escape from its premises and to ignite plaintiffs' building.

In determining whether the evidence as to the cause of the fire was sufficient to justify the verdict of the jury, it is well to remember that we must interpret the evidence in the light most favorable to plaintiffs. Though it be contradictory in character, if that favoring the plaintiffs is sufficient to make a case that must go to the jury, we cannot disturb the verdict. Bearing in mind that defendant's argument, so far as the facts are concerned, is grounded upon the proposition that the physical facts completely destroyed the credibility of the witnesses for plaintiffs, we must examine the facts in order to determine whether a *prima facie* case requiring submission to the jury was made.

Plaintiffs' cement block factory is located at the edge of the village of Cary, Illinois, on the west side of route 14. To the rear of the building, as well as of that of defendant's premises, are the tracks of the Northwestern Railroad, running to Chicago. Just south of plaintiffs' plant and somewhat to the west thereof, is a steel quonset building owned by the Curtiss Candy Company, used as a repair shop. To the south of this lie defendant's premises. Its buildings are nearer the highway than those of Curtiss, so that there is an unobstructed view from plaintiffs' building on the north to defendant's plant on the south. The distance from defendant's building to that of plaintiffs' is estimated by various witnesses at from 150 to 300 feet.

Defendant is engaged in the manufacture of strong tape for binding and reinforcing the corners and edges of cardboard boxes. The tape consists of two plies of brown paper, reinforced with spun glass fiber inserted between the plies, with other material, such as glue or paste, to bind the elements together. All the scrap remaining from the manufacture is burned in the rear of defendant's premises, together with substantial amounts of tissue paper, in an area said to be enclosed by chicken wire fencing, in piles some 5 feet in diameter. The evidence indicates that the scrap other than the tissue paper burns slowly but steadily.

Defendant has been burning scrap on its premises since 1950, burning a substantial amount every day. Plaintiffs offered evidence of hazardous conditions both before and at the time in question. Thus, a witness who operated a gas service station slightly more distant from defendant's premises than plaintiffs' property, testified that defendant's burning area was almost the size of the trial courtroom; that there had been numerous fires there within a week or so prior to October 9, from which burned chunks

of paper blew across to his driveway, in and about his gas pumps, and that he complained repeatedly to the police about these occurrences. Another witness, who operated the repair shop on the Curtiss property, testified that the burning area was about 20 feet square; that, prior to the time in question, burning particles had flown into his quonset hut, through the windows and doors, so that they had to be closed; that he complained frequently to defendant's plant manager and its foreman, as well as to the fire department of the village; that the burning particles from defendant's fire flew 30, 40 or 50 feet into the air; that the fires continued to burn after defendant's employees who had set them went away; that the burning continued after he made his complaints, and that burning of the waste had caused at least one fire to defendant's shack located at the rear of its premises.

It is undisputed that on the evening of October 8 defendant's employees had burned paper in the area used for that purpose. Two witnesses testified that, from a Northwestern train on which they were travelling, they saw a fire at the rear of defendant's premises at 7:30 P.M. Another, that at approximately 1 o'clock in the morning of October 9, there was a "good-sized" blaze in the rear of defendant's plant and that there was at that time a moderate wind. Police Officer Jungnickel testified that about 3 o'clock A.M., on October 9, he saw a fire in the rear of defendant's property from which sparks rose 50 feet; that the wind was blowing sparks and burning particles in the direction of plaintiffs' plant; that they were "great big" sparks, some of them passing over plaintiffs' building; that there was a pretty good wind; that he warned defendant's night watchman about this situation, and reported it to his chief; that he turned in the fire alarm at approximately 3:00 A.M., and that, when the firemen arrived, defendant's bonfire was still burning and throwing sparks. Plaintiff William Gearhardt testified that he arrived at the scene on the morning of October 9 some-

time between 6 and 7 o'clock, and shortly thereafter found a live fire in the area where defendant customarily burned its waste paper.

The fire in plaintiffs' building was discovered at approximately 3:30 A.M. some 30 minutes after sparks and burning particles had been seen blowing in to the area around the building. There was testimony that on the second floor of the building, on the south end, there was an overhead garage door so that when one looked out of the door, he would look toward defendant's burning area; that just inside the door there were lumber, tar and other combustible materials; that the door could have been open; that on the side of the building on the second floor, which faced the highway, there were three windows and a row of windows facing the railroad tracks; that in the south end of the second story there was a large window and a large garage door, 8' x 7'; that a couple of the windows were broken; that the door was normally left open for a draft and closed only when it was raining or when the weather was cold; that the roof was wood covered with tar paper. The night was a clear mild October night. Various other circumstances tending to corroborate plaintiffs' testimony were proved.

██ It would seem perfectly obvious that this evidence, if believed by the jury, to which we are bound to believe that it gave credence, made a *prima facie* case for plaintiffs. There was no evidence of any probable cause of the fire other than that indicated in the recited testimony. In this situation it was necessary for the court to submit the cause to the jury.

In this connection plaintiff argues that the credibility of the witnesses who testified that flames, sparks and burning paper fell around and upon the building is positively refuted by the physical facts and, therefore, must be disregarded. In this connection, defendant reviews the testimony of other witnesses. However, upon mature consideration, we find in the record no evidence which irrefutably negates the testimony of Jungnickel and

Gearhardt. True, some witnesses did not see or did not remember seeing any fire on defendant's property; but that is not a surprising situation. It merely reflects negative testimony of witnesses who were interested solely in watching the main fire.

Defendant observes that a tree near plaintiffs' building was not completely destroyed but lost only the leaves on the limbs nearest the building. It argues therefore, that there would not have been a southwest wind as was indicated by the testimony of some witnesses. But to our mind this has little or no significance. If the fire started from the inside, from sparks blown through the open door, it is not surprising that, as it worked upward through the roof, it had not progressed far enough to consume the entire tree before the firemen arrived.

We have examined the voluminous record carefully. We find nothing to impel us to say, as a matter of law, there were any physical facts completely refuting the testimony of the witnesses who testified positively as to the existence of burning paper in defendant's back yard and flying sparks therefrom as late as 3 o'clock in the morning. Whether the wind was from the southeast or southwest, or whether it blew in varied gusts from one direction and then from another, as is frequently the case, is immaterial. There was testimony as to the situation which required that the cause be submitted to the jury. Defendant has cited decisions in which it has been held that the physical facts absolutely refuted the oral testimony, but none of them presented such a state of the record as we have here.

Defendant seeks in this respect to have us contrast, compare and weigh the testimony of plaintiffs' witnesses and that of defendant's witnesses upon the question of whether the fire originated on the inside or the outside of the building. The jury had the right to determine these issues. They knew that some witnesses described the whole second floor as "an inferno", or as "a furious fire"; and

that, when the firemen arrived, fire was coming through the roof or from the roof. They had the testimony as to flying sparks. Whether the fire started on the roof or came from sparks carried in through the window or door, we think, is wholly immaterial.

■ The rule governing such cases is well stated in Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825, 839, thus: "Generally speaking, direct and positive testimony to specific acts of negligence is not required to establish it. Circumstantial evidence is sufficient, either alone or in combination with direct evidence. Circumstantial evidence may contradict and overcome direct and positive testimony. The limitation on its use is that the inference drawn must be reasonable. But there is no requirement that the circumstances, to justify the inferences sought, negative every other positive or possible conclusion. The law is not so exacting that it requires proof of negligence or causation by testimony so clear that it excludes every other speculative theory." And, in National Lead Co. v. Schuft, 8 Cir., 176 F.2d 610, the fire was charged to have been caused by an accumulation of lignite coal dust. The court, after commenting that, though there was no direct proof of how the fire started, if the jury believed the testimony, it was logical for it to infer that some form of gaseous propagation had occurred, and added (at pages 613, 614): "Inferences made from probative facts do not constitute legal speculations, if they can be said to be probabilities by the test of common judgment. Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825, 840. * * * No possible basis therefore can be claimed to exist for the contention that as a matter of law the theory of plaintiffs was not 'inconsistent with any other rational theory.' A theory of proximate cause resting in probative circumstances does not become a matter of speculation and conjecture by a mere suggestion of other possible causes which are unsupported by any proved facts. Sears, Roebuck & Co. v. Peterson,

8 Cir., 76 F.2d 243, 247." See also Schulz v. Pennsylvania Railroad Co., 350 U.S. 523, 76 S.Ct. 608, at page 610, 100 L.Ed. 668, and Terminal Railroad Ass'n v. Farris, 8 Cir., 69 F.2d 779.

Defendant complains of the admission in evidence of former occurrences in the course of defendant's burning papers. There was testimony as to the continued character of these conditions, and we know of no reason why the jury should not have had the benefit of its admission to show the dangerous condition arising from defendant's practices in burning paper, and to prove that defendant had notice of such condition through the complaints made and failed to desist from the practice. In Sears, Roebuck & Co. v. Copeland, 4 Cir., 110 F.2d 947, 949: "Such evidence tends to show the dangerous qualities of the thing or place, and knowledge of these qualities on the part of the owner or possessor. Wigmore on Evidence, 2d Ed., §§ 252 and 458. * * The rule of evidence under discussion rests in part upon the inference that conditions of a continuing nature, once shown to exist, will persist." Wigmore on Evidence, 2d Ed., § 437. And as pointed out in 65 C.J.S. Negligence § 234, pp. 1053, 1054: "Where the dangerous or safe character of the place, method, or appliance which is alleged to have caused the accident or injury is in issue, evidence is admissible in a proper case that other similar accidents or injuries, actual or potential, have resulted at or from such place, method, or appliance, whether before the accident in suit, at the same time, or thereafter." See also Wigmore on Evidence, Vol. 1, § 442, p. 522 (1904).

Defendant also complains because the court permitted police officer Jungnickel to testify, though his name had not been included in the list of witnesses with which plaintiffs had supplied defendant. The evidence is that the name was supplied but was spelled Youngnickel instead of Jungnickel; that the witness's brother spelled his name with a "Y" and the witness with a "J"; that all the firemen knew him, and that various of defendant's witnesses knew him. We know of no rule which made it improper to admit the testimony. There was no evidence of trickery on the part of plaintiffs, no evidence that they were attempting to take advantage of defendant. In this situation we think it would have been error for the court not to have admitted the testimony.

Finding no error in the record, the judgment is affirmed.