**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230426-U

Order filed October 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| LUIS RODRIGUEZ, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Du Page County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| THE MILDRED ANTONACCI 2016 LIVING | ) | |
| TRUST; MILDRED ANTONACCI, | ) | |
| individually and as trustee of THE MILDRED | ) | |
| ANTONACCI 2016 LIVING TRUST; | ) | |
| ANDREW ANTONACCI individually and as a | ) | Appeal No. 3-23-0426 |
| trustee of THE MILDRED ANTONACCI 2016 | ) | Circuit No. 20-L-1472 |
| LIVING TRUST; NORTHERN ILLINOIS | ) | |
| GAS COMPANY d/b/a a/ka NICOR GAS | ) | |
| COMPANY, a domestic corporation, and | ) | |
| SOUTHERN COMPANY SERVICES, INC., | ) | |
| a foreign corporation, Defendants (The Mildred | ) | |
| Antonacci 2016 Living Trust; Mildred | ) | |
| Antonacci; Andrew Antonacci; and Northern | ) | |
| Illinois Gas Company, | ) | The Honorable |
| | ) | Neal W. Cerne |
| Defendants-Appellees). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justice Peterson specially concurred, with opinion, joined by Justice Hettel.

_____

**ORDER**

¶ 1    *Held*:    Under the facts of this case, the trial court properly granted the defendants' summary judgment motions because: (1) no material questions of fact remained; and (2) the evidence established that they were not legally liable for the plaintiff's injuries as a matter of law.

¶ 2    The plaintiff, Luis Rodriguez, slipped on some plexiglass covering a portion of the walkway beside a house owned by The Mildred Antonacci 2016 Living Trust and was injured. He filed a complaint alleging that the Trust's negligence was the proximate cause of his injuries. Because Nicor had performed work in that area prior to the fall, Rodriguez named it as an additional defendant in the complaint, alleging that its negligence proximately caused his injuries.

¶ 3    Nicor and the Trust filed motions for summary judgment, which were granted by the trial court. Rodriguez appealed, and we affirm the trial court's summary judgment orders.

¶ 4                                I. BACKGROUND

¶ 5    Rodriguez was a police officer for the Village of Woodridge. On December 29, 2018, he was seriously injured after slipping on a sheet of plexiglass lying on a sidewalk beside a house owned by the Trust. The beneficiaries of the Trust were Mildred Antonacci and Andrew Antonacci, who lived at the house. The Antonaccis had been living in Florida for about two months, however, when Rodriguez was injured, leaving the house unoccupied. At the time he was injured, Rodriguez was conducting a routine vacation watch check that Mildred had requested before departing for Florida. Because the plexiglass was covered with between a half-inch and an inch of fresh snow, Rodriguez did not see it prior to his fall.

¶ 6    During the weeks preceding Rodriguez's fall, workers from both Nicor and Grid One, acting under contract with Nicor, had performed work in the same area of the yard where Rodriguez fell. On December 7, Nicor responded to the house to address a natural gas emergency and replaced a leaking gas valve. On December 17, Grid One installed a new

automated meter-reading module on the meter pursuant to its contract with Nicor. During the repair process, neither worker recalled either seeing any plexiglass or placing any plexiglass near where Rodriguez later fell, although the Grid One worker recalled moving something from in front of the gas meter so that he could perform his work.

¶ 7 Rodriguez filed a personal injury complaint on December 18, 2020, alleging both that the Trust's negligence in creating or permitting an unsafe condition to exist on the property resulted in his injuries and that Nicor's negligent performance of its work proximately caused those same injuries. Nicor then filed a third-party complaint against Grid One, alleging that its work as an independent contractor had caused or contributed to Rodriguez's injuries. The Trust maintained that, although the Antonaccis had secured some plexiglass behind a shed near the walkway before leaving for Florida, it was unclear if it was the same material that caused Rodriguez's fall or how any plexiglass came to rest on the walkway.

¶ 8 Both the Trust and Nicor filed motions for summary judgment. The Trust asserted that the Antonaccis did not owe a duty to Rodriguez because they did not know, and had no reason to know, about the dangerous condition. For its part, Nicor asserted that the evidence was insufficient, as a matter of law, to establish its negligence. The trial court granted summary judgment for the Trust and Nicor in August 2023, and Rodriguez appealed.

¶ 9                                              II. ANALYSIS

¶ 10 Three issues are raised on appeal: (1) whether the trial court properly granted summary judgment for the Trust; (2) whether the trial court properly granted summary judgment for Nicor; and (3) whether the summary judgment orders were properly supported by a finding that Rodriguez assumed the risk of walking on the snow-covered path. Because the propriety of a grant of summary judgment involves only questions of law, our review on appeal is *de novo*.

3

*Acuity v. M/I Homes of Chicago, LLC*, 2023 IL 129087, ¶ 20. Summary judgment is proper when all the pleadings, depositions, admissions, and affidavits, when construed strictly against the movant, establish that no genuine question of material fact exists, and the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Gillespie v. Edmier*, 2020 IL 125262, ¶ 9.

¶ 11                                    A. Summary Judgment for the Trust

¶ 12        Rodriguez contends the trial court erred by granting summary judgment for the Trust because the evidence shows that the Antonaccis had knowledge of the dangerous condition and did not act to remedy that condition. They negligently left unsecured debris near where the injury occurred despite knowing that materials placed there were susceptible to being moved by wind and weather. He maintains that the Antonaccis acted negligently by failing to secure the materials stored in the area along the side of the house before leaving for Florida for roughly six months and by failing to have anyone monitor the area during their absence. Rodriguez argues that the Antonaccis had a duty to keep the property in a reasonably safe condition and that they could not escape that duty by turning a blind eye to the changing condition of their property.

¶ 13        In support, Rodriguez cites *Blue v. St. Clair Country Club*, 7 Ill. 2d 359 (1955). There, the Illinois Supreme Court found sufficient proof of negligence and proximate causation to create liability when the evidence showed that the defendant country club knew that its patio tables and umbrellas had previously blown over due to strong gusts of wind, creating a potential hazard for patrons, but did nothing to minimize that danger. Liability was held to exist even though, as here, no prior injuries had been reported. *Id*. at 363-64. Rodriguez argues that the owner's knowledge that the tables and chairs could be moved by the wind put it on reasonable

4

notice that a patron such as the plaintiff could be injured when a table was toppled by a sudden gust, creating liability.

¶ 14 We conclude that *Blue* is readily distinguishable because there the defendant country club knew that the wind had previously created potentially dangerous conditions, making it reasonably foreseeable that a similar danger would again occur. The evidence showed that the country club owners were aware that high winds had previously detached table umbrellas from the outdoor tables, causing the umbrellas to blow around. The plaintiff in that case was injured when she was reaching to close a table umbrella and it blew 10 to 15 feet into the air in a sudden wind, causing the table to knock the patron to the ground. *Id*. at 362, 364. In contrast, here no evidence suggests that any plexiglass had previously been dislodged from its storage place in the Antonaccis' side yard. Therefore, it was not reasonably foreseeable that the plexiglass the Antonaccis had secured between the back of a shed and the brick exterior of their house would be dislodged and come to rest on the nearby walkway. Nor was it reasonably foreseeable to the Antonaccis that a gas leak would occur and require an emergency replacement of their meter or that a subcontractor for Nicor would subsequently be in the area to install a new module on that meter.

¶ 15 In fact, the decision in *Blue* tends to support the Trust's position. It states that a property owner's duty to an invitee, such as Rodriguez, is "to exercise reasonable care for his visitor's safety and to warn the visitor of any defects which are not readily apparent. *Ellguth v. Blackstone Hotel, Inc.*, 408 Ill. 343; *Pauckner v. Wakem*, 231 Ill. 276. This applies not only to known defects but also to those conditions *which could have been known had the landowner used reasonable care*. 65 C.J.S., Negligence, s 45, p. 526; Restatement of Torts, vol. II, sec. 343." (Emphases added.) *Blue*, 7 Ill. 2d at 363. The record here shows that Rodriguez was unable to

see the plexiglass on the path because it was covered by one-half to one inch of snow that had fallen a few hours earlier. We cannot say that the standard of reasonable care was breached simply because the Antonaccis did not immediately check to see if a minor snowfall had obscured a previously unknown potential hazard on the side of their house.

¶ 16       Moreover, the degree of knowledge expected of the owners of a commercial business such as the country club in *Blue* is quite different from that expected of private homeowners who did not invite others onto their property for commercial gain. "As is said in Restatement of Torts, vol. II, sec. 343(f): 'A possessor who holds his land open to others for his own business purposes, must possess and exercise a knowledge of the dangerous qualities of the place itself and the appliances provided therein, which is not required of his patrons.' " *Blue*, 7 Ill. 2d at 363. Due to the timing of the snowfall and the absence of any evidence suggesting that stored plexiglass had previously created a hazard after becoming dislodged, we cannot say that the Trust's failure to inspect the walkway in the few hours between the minor snowfall and Rodriguez's arrival was unreasonable.

¶ 17       Rodriguez next argues that it was error to find that the Trust would not be liable if Nicor or Grid One moved the plexiglass from its storage spot because storing material behind the gas meter violated state regulations and was contrary to Nicor's instructions to keep that area free from obstructions. He adds that a material question of fact existed about whether the Antonaccis should have discovered, in the exercise of ordinary care, the dangerous condition created by the plexiglass when several weeks passed between their departure and the work on the meter. According to Rodriguez, the Antonaccis knew that unsecured materials had previously been blown around during the winter and that Nicor replaced the faulty meter on December 7, putting them on constructive notice that the plexiglass could have become dislodged, creating a hazard.

6

Despite 12 days passing between Grid One's installation of the new monitoring module on December 17 and Rodriguez's injury on December 29, the Trust did nothing to confirm that the plexiglass was still safely stowed away, making it liable for his injuries.

¶ 18       Our review of the appellate record refutes that argument. In his deposition, Andrew testified that he had stored a thin sheet of plexiglass between a shed and the brick wall of the house and that the plexiglass was not on the walkway when he left for Florida two months earlier. Although he admitted that a sheet of plexiglass had been stored behind the gas meter, that material was nearly one-inch-thick plexiglass, whereas the material that caused Rodriguez's fall was significantly thinner. Although Rodriguez contends that Andrew admitted that he stored thin plexiglass similar to that on which he fell behind the gas meter, that contention was not supported by Andrew's deposition testimony. Andrew consistently testified in his deposition that only the thick plexiglass was wedged behind the gas meter to secure it and that the thin sheet of plexiglass was stored behind the shed. In sum, Rodriguez did not offer any direct evidence of how the plexiglass on which he fell came to rest on the walkway to support his complaint.

¶ 19       Of course, Rodriguez did not have to present direct evidence to support his claims. He also could have relied on circumstantial evidence. Any circumstantial evidence, however, had to be "of such a nature and so related as to make the conclusion *more probable as opposed to merely possible*." (Emphasis added.) *Majetich v. P.T. Ferro Construction Co.*, 389 Ill. App. 3d 220, 225 (2009).

¶ 20       Here, the only evidence Rodriguez offered on proximate causation was testimony that items like empty trash cans had sometimes been blown around the side yard storage area by the wind while the Antonaccis were away over the winter. Nothing in the record suggested that stored sheets of thin plexiglass had ever been blown around that area or that the Antonaccis had

7

any reason to believe that the thin plexiglass stored against their house and behind their shed would have been dislodged by either wind or unforeseen meter work. We conclude that Rodriguez failed to present sufficient circumstantial evidence to show, within a reasonable degree of certainty, that it was not "merely possible" but "more probable" that the thin plexiglass was no longer in its storage place and that the Antonaccis should have known it was on the walkway. See *id.* Accordingly, we hold that Rodriguez did not carry his burden of making a *prima facie* showing of proximate cause and that the trial court properly granted the Trust's motion for summary judgment.

¶ 21                                    B. Summary Judgment for Nicor

¶ 22        Rodriguez similarly argues that the trial court erred by granting summary judgment for Nicor because the court incorrectly believed that he was required to provide direct evidence of negligence by showing how the plexiglass came to rest on the pathway when circumstantial evidence was sufficient. See *Mort v. Walter*, 98 Ill. 2d 391, 396 (1983). He maintains that he offered strong circumstantial evidence that the Nicor employee moved the plexiglass on December 7 and that Nicor's subcontractor, Grid One, relocated the plexiglass within the yard on December 17, creating the hazard that led to his fall. Rodriguez contends that the Nicor employee was unsure of whether he moved the plexiglass, but if he did, he most likely would have placed it against the house far enough away from the meter to allow him to perform his work. That would put the plexiglass in the vicinity of his fall. Rodriguez contends that theory is further supported because the Grid One employee indicated that he did not see any plexiglass stored behind the gas meter on December 17, suggesting that the Nicor worker had previously moved the material that had been stored there.

8

¶ 23      As Rodriguez correctly notes, circumstantial evidence may be sufficient to support a reasonable inference of negligence (*Mort*, 98 Ill. 2d at 396) and that he was not required to offer evidence that "excludes all other possible conclusions" (*Fuery v. Rego Co.*, 71 Ill. App. 3d 739, 743 (1979) (quoting *Pearson v. Ford Motor Co.*, 32 Ill. App. 3d 188, 191 (1975)). To make the requisite showing, however, Rodriguez had to present evidence making the conclusion that another's negligence proximately caused his injuries *probable*, not merely possible. *Wrobel v. City of Chicago*, 318 Ill. App. 3d 390, 398 (2000). Here, that burden entailed providing evidence that Nicor's employee or agent moved the plexiglass to gain access to the gas meter, causing it to later rest on the walkway where Rodriguez fell.

¶ 24                                1. Nicor's Direct Liability

¶ 25      The record reveals, however, that the Nicor employee did not recall moving any plexiglass while he was making the emergency repairs on the gas meter on December 7. Nonetheless, Rodriguez asserts that by not affirmatively denying that his access to the meter had been obstructed or that he moved the plexiglass to perform the repairs, the Nicor employee necessarily admits that he could have moved it. We find that inference to be untenable. The Nicor employee's testimony that he did not remember whether anything blocked the meter when he arrived or whether he had to move any material to perform his work is insufficient to carry Rodriguez's burden of providing evidence affirmatively establishing Nicor's negligence. See *Gyllin v. College Craft Enterprises, Ltd.*, 260 Ill. App. 3d 707 (1994) (upholding summary judgment for the defendant employer after the employee could not remember why his vehicle crossed the center line, causing an accident, but thought fumes from a spill on his work clothes could have rendered him unconscious). Here, the Nicor employee's testimony that he did not

9

recall seeing or moving any plexiglass strongly suggests that he also did not move any plexiglass to perform his work.

¶ 26    In sum, Rodriguez's theories of causation are speculative and unsupported by the evidence. The Nicor employee stated that he never ventured further onto the property than the gas meter, indicating that he did not place the plexiglass further into the yard, where it could later fall across the walkway. Although Andrew Antonacci admitted that he had previously stored some plexiglass by propping it behind the gas meter, he specified that the material stored there was nearly an inch thick and was virtually unbreakable. In contrast, the evidence shows that the plexiglass on which Rodriguez fell was thin and that it broke when he fell. Thus, the evidence contradicts Rodrigeuz's theory that Nicor had moved the thin plexiglass that caused his fall from behind the gas meter to access the gas meter.

¶ 27    According to Andrew, the thin plexiglass on which Rodriguez slipped was typically stored between a shed and the brick wall of the house and was not located near the gas meter. While Rodriguez claims that Andrew's deposition testimony indicated that some thin plexiglass was stored behind the meter, our reading of the record does not support that conclusion. Andrew clearly distinguished between the two types of plexiglasses on the property and where they were stored, with the thick, unbreakable plexiglass being the only type stored behind the gas meter. Rodriguez bore the burden of establishing a "*probable*" nexus between Nicor's actions and his injuries, not merely a "possible" one. *Wrobel*, 318 Ill. App. 3d at 398. Although he claims that the evidence shows that "it is *possible* that the plexiglass was tucked behind the gas meter," that is not sufficient to demonstrate that Nicor "*probably*" contributed to his injuries by relocating the plexiglass.

¶ 28       In support of his argument that the circumstantial evidence here was sufficient to find negligence and award damages, Rodriguez cites *Pearson v. Ford Motor Co.*, 32 Ill. App. 3d 188, 189 (1975), and *Wright v. Steck*, 7 Ill. App. 3d 1068, 1070 (1972). Those cases are, however, readily distinguishable.

¶ 29       In *Pearson*, the plaintiff established *prima facie* proof of the defendant's negligence by providing unchallenged evidence that the equipment that allegedly caused the injury was new, stamped with the defendant's name, and had been shipped alongside identical machines. *Pearson*, 32 Ill. App. 3d at 191. The court found that evidence sufficient to create a rebuttable presumption that the defendant owned and controlled the equipment and, consequently, had a duty to secure the machine's ladder to prevent it from causing harm during transport. *Id*. Unlike in *Pearson*, however, here defendant Nicor did not own the plexiglass or control where or how it was stored, and, in any event, nothing in the record shows that its employee moved any plexiglass to the location of the fall.

¶ 30       Similarly, *Wright* was a premises liability case in which the decedent died after falling down a poorly lit and garbage-covered stairway in the defendant's building. *Wright*, 7 Ill. App. 3d at 1069. Because the evidence clearly established the ongoing hazardous condition of the stairs, the jury could permissibly find that the defendant's negligent maintenance was a proximate cause of the fatal fall. *Id*. at 1070. Here, however, defendant Nicor had no role whatsoever in the routine maintenance of the Trust's property, and no evidence affirmatively showed that the actions of any of its employees or agents created the slip hazard on the walkway. Due to the lack of supporting evidence in the record, any finding that Nicor proximately caused Rodriguez's injuries by moving a sheet of thin plexiglass from behind the meter would be purely speculative.

11

¶ 31                            2. Grid One's Alleged Agency

¶ 32        Nonetheless, Rodriguez also seeks to tie Nicor's liability to the subsequent work

performed by the Grid One worker, alleging that he was acting as Nicor's agent when he entered

the property to install a new module on the gas meter. As our Supreme Court has stated, the

question of agency must be individually determined from the specific facts and circumstances in

each case. The overarching consideration in that inquiry is whether the alleged principal

" 'retains the right to control the manner of doing the work.' " *Lawlor v. North American Corp.*

*of Illinois*, 2012 IL 112530, ¶ 44 (quoting *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill.

2d 17, 46 (1999)). The Court also offered several factors to be considered in making that

determination: "(1) the question of hiring; (2) the right to discharge; (3) the manner of direction

of the servant; (4) the right to terminate the relationship; and (5) the character of the supervision

of the work done." *Id*. Rodriguez posits some additional factors that our appellate court has

deemed to be relevant: (1) the right to control the manner of work; (2) how the work and taxes

are paid; (3) the skill needed to perform the work; and (4) the furnishing of tools, materials, and

equipment needed for the work. *Simich v. Edgewater Beach Apartments, Corp.*, 368 Ill. App. 3d

394, 402 (2006).

¶ 33        Rodriguez argues that, at a minimum, the evidence here creates a question of fact about

whether the Grid One worker was acting as an agent of Nicor because it shows that Nicor

exercised "significant" control over his work, precluding the entry of summary judgment.

Rodriguez notes that Nicor provided Grid One employees with in-person training, testing, and

certification, owned the meters to be modified, provided the modules to be installed, controlled

the installation process, and placed hangers on customers' doors that included Nicor's logo and

an explanation that the work was being done on its behalf. In addition, he asserts that the contract

12

between Nicor and Grid One allowed Nicor to review and approve every step in the installation process and to conduct work audits, controlled the number of modules being installed, and gave Nicor the right to stop any work that violated its policies or procedures. According to Rodriguez, that is a sufficient *quantum* of evidence to create a material question of fact about whether the Grid One employee was acting as Nicor's agent when he installed the module on the Antonaccis' gas meter on December 17.

¶ 34        After carefully reviewing the appellate record, however, we are not persuaded by Rodriguez's argument. Although the Grid One employee testified that was trained to be part of a special operations team for the installation project, that training addressed how to handle a broken gas meter screw. Moreover, it was conducted by Grid One personnel at Grid One's own warehouse. The worker characterized his interaction with Nicor as "more of like completing a final test with Nicor than actually getting trained by Nicor staff." In addition, the "testing" he underwent was limited to "probably a three-to-five minute test of me showing how to complete the – the work." According to the worker, Nicor did not provide any training on how to access a customer's property, address any potential safety hazards at the site, or relocate any items on the premises that obstructed the area. The Grid One employee testified that he worked alone on each job site and was never monitored by Nicor.

¶ 35        The contract between Nicor and Grid One provides further support for the conclusion that Nicor did not have an agency relationship with the Grid One worker. Both the Master Services Agreement ("MSA") and the testimony of Grid One executive Brian Carr established that Grid One was an independent contractor, not an agent. Critically, section 13.8 of the MSA *expressly stated in the parties' agreement that Grid One was acting solely as Nicor's independent*

13

*contractor and not as its agent*. The parties' express agreement about the nature of their relationship merits great significance in our analysis.

¶ 36    In addition, MSA Section 10.2 stated the parties' agreement that Nicor did not undertake any duty to Grid One's employees, while section 10.1 of the MSA and section II.A.1.c. of the Statement of Work ("SOW") declared that Grid One was responsible for ensuring the safety of the work performed by its own employees. Section II.D.1. of the SOW stated that Grid One was responsible for training its employees on the work to be performed, and section II.D.2. required Grid One to provide its employees with all necessary equipment and materials. Section II.C.2. of the SOW made Grid One responsible for providing supervisors for the work, and Grid One agreed in section II.C.3. of the SOW to mandate that the work be done in a professional manner. Under section II.C.6. of the SOW, Grid One bore the responsibility to "solely determine the workforce and wage scales it requires to meet the requirements of this SOW." In section 11.2 of the MSA, Grid Once agreed to "full and exclusive liability for the payment of any and all contributions and taxes for unemployment compensation, disability insurance, old age pension, or annuities, and all similar provisions. *** which are imposed with respect to or measured by wages, salaries, or other compensation paid by [Grid One] to persons employed or retained by [Grid One]." Taken together, the MSA and SOW show that Grid One and its employees were not acting as Nicor's agents.

¶ 37    That conclusion is further supported by the testimony of Brian Carr, who was Grid One's Director of Operations when it entered into the contract with Nicor in 2018. Carr confirmed that Nicor did not instruct, supervise, or control any Grid One employees in moving or removing items found on a customer's property. Pursuant to the contract, Grid One was responsible for providing all safety training and supervision for its employees, with any work audit by Nicor

14

being optional and limited to reviewing the work after its completion. Carr added that Nicor was responsible only for broken meters or issues that arose during the installation process that substantially obstructed Grid One's access to a meter, such as an existing deck or fence. After it determined how to resolve those issues, Nicor had the option of redeploying Grid One to the site.

¶ 38　　In considering the remaining *Lawlor* factors, we find that they also support the conclusion that Grid One was not an agent of Nicor. The undisputed evidence establishes that Grid One was solely responsible for hiring and discharging its own employees and that the MSA permitted Nicor to terminate the party's agreement based on either convenience or Grid One's commission of a material breach.

¶ 39　　Thus, absent any evidence that Nicor fired, hired, paid, controlled, trained, or supervised any Grid One workers, we conclude that Grid One was not acting as its agent as a matter of law. Accordingly, Nicor was not legally responsible for the conduct of any Grid One employee that could be proximately linked to Rodriguez's injuries, and we need not consider whether the conduct of Grid One's employee constituted negligence. The trial court did not err in awarding summary judgment to Nicor.

¶ 40　　　　　　　　　　　　　C. Assumption of Risk

¶ 41　　Lastly, Rodriguez asserts that the trial court erroneously concluded that Rodriguez assumed the risk of walking on the snow-covered walkway to justify its award of summary judgment. We need not address that question, however, because we uphold the summary judgment orders on other grounds.

¶ 42　　　　　　　　　　　　　III. CONCLUSION

¶ 43　　For the reasons stated, we affirm the orders of the circuit court of Du Page County granting summary judgment in favor of the Trust and Nicor.

15

¶ 44        Affirmed.

¶ 45        JUSTICE PETERSON and JUSTICE HETTEL, specially concurring:

¶ 46        Although we concur in the result, we do not join in the analysis contained in paragraphs 31 through 39 regarding agency. We believe that the analysis is unnecessary to the outcome of this matter because we affirm the circuit court's conclusion that there were no material issues of fact and the named parties were not, as a matter of law, liable for negligence.